IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

INTERNATIONAL SECURITY MANAGEMENT   )
GROUP, INC.,   )
   )
      Plaintiff,   )
   )
v.   )   Case No. 3:06cv0456
   )
CHRISTOPHER SAWYER and CITADEL   )   Judge Thomas A. Wiseman, Jr.
SECURITY SERVICES, LLC,   )
   )
      Defendants.   )

## MEMORANDUM OPINION

Plaintiff International Security Management Group, Inc. ("ISMG") filed its Complaint against Defendants Christopher Sawyer ("Sawyer") and Citadel Security Services, LLC ("Citadel") (collectively, "Defendants") on May 8, 2006 alleging, among other things, that Sawyer individually and through Citadel was in violation of certain restrictive covenants set forth in an employment agreement ("Employment Agreement") between Sawyer and ISMG, his former employer. Among other requested relief, the Complaint seeks temporary, preliminary and permanent injunctive relief prohibiting Sawyer, individually or through Citadel, from further breach of the Employment Agreement.

Along with its Complaint, ISMG filed an Emergency Application For a Temporary Restraining Order ("TRO"). The hearing on Plaintiff's Emergency Application was held on May 9, 2006 and resulted in the entry of a TRO by Judge Haynes, also on May 9, 2006 (Doc. No. 10). Now pending is ISMG's motion to convert the TRO into a preliminary injunction (Doc. No. 12). In addition, ISMG also argues that it is entitled to a preliminary injunction barring Defendants from soliciting current ISMG employees in violation of the Employment Agreement, which issue was not addressed in the TRO. Defendants have filed a response in opposition to Plaintiff's motion (Doc. No. 14) and ISMG filed a reply brief (Doc. No. 17). An evidentiary hearing was conducted on Monday, May 22, 2006 and the issue is ripe for consideration.

For the reasons explained herein, ISMG's motion to convert the TRO into a preliminary injunction will be granted in part and denied in part, and a preliminary injunction will enter.

## I.      FINDINGS OF FACT

Plaintiff ISMG, a Georgia corporation, is in the business of providing private security services for office buildings and other establishments throughout the southeastern United States. As part of its services, ISMG provides security guards, electronic security systems, and remote monitoring arrangements. ISMG's service area includes Tennessee and Kentucky. The Tennessee/Kentucky territory is managed from ISMG's Nashville, Tennessee office. ISMG presently has approximately fifty employees managed through its Nashville office.

ISMG maintains that the security services business is highly competitive, and that ISMG's continued survival in the Nashville market depends upon certain confidential information that ISMG has developed over the course of a number of years. ISMG presented evidence at the hearing that its business information is very valuable and is maintained with secrecy. In particular, ISMG contends that information about specific services, techniques, pricing models and customers is closely guarded, confidential business information that cannot be easily or readily ascertained by competitors. According to ISMG, this information, which is maintained in both electronic and hard-copy format, was compiled through and by the use of ISMG's ingenuity, time, market- and product-development strategies, investigation and experience.

In the course of performing business, ISMG discloses a significant amount of its confidential, proprietary and trade secret information to senior management employees. ISMG takes steps to protect the confidentiality of this information, including requiring its key employees to execute employment agreements containing certain restrictive covenants. ISMG also has adopted internal policies whose purpose is to protect confidential, proprietary and trade secret information from unnecessary disclosure to third parties.

Defendant Chris Sawyer began working for ISMG in its Atlanta, Georgia office as a business development manager in or around November 1999. He was promoted to the position of District Manager for the region encompassing Tennessee and Kentucky and transferred to ISMG's Nashville office in June 2003. Sawyer remained in that position until he resigned on April 13, 2006. At the time of his departure, Sawyer was the most senior employee in ISMG's Tennessee/Kentucky district.

As District Manager in the Nashville office, Sawyer was responsible for, *inter alia*, procuring new clients for ISMG,[1] servicing existing ISMG clients to maintain their accounts, overseeing all negotiations for

---

[1]The evidence presented at the hearing indicated that ISMG employee Asa Helton is primarily charged with procuring new business in the Tennessee/Kentucky market, while Sawyer's primary focus is on developing and maintaining clients obtained by Helton. Sawyer maintained that client procurement was not

2

new and renewal contracts for ISMG clients in Tennessee and Kentucky, and ensuring compliance with all company policies, procedures and practices, including those related to maintaining the confidentiality of the company's proprietary and customer information.

At the time he was first hired in November 1999, Sawyer executed an employment agreement containing non-solicitation and confidentiality/non-disclosure covenants. Although he moved to Nashville in June 2003, Sawyer did not sign a new agreement in relation to his employment in the Tennessee/Kentucky market until March 22, 2005. Sawyer testified that he believed he would have been required to leave the company if he had not signed the agreement at that time. This updated agreement ("Employment Agreement") contained the same restrictive covenants as the first and covered ISMG's Tennessee/Kentucky territory. In pertinent part, the Employment Agreement states as follows:

> In consideration of the Company's [ISMG's] continued employment of Employee [Sawyer], Employee agrees as follows:
>
> . . . .
>
> 2.      Employee promises that for (1) year following the termination of that employment with the Company, for any reason whatsoever, Employee shall not disclose to any person the . . . business secrets ("Business Secrets") of the Company [as defined in parts 2(a) through 2(h) of the Agreement] . . . .
>
> 3.      (a) Employee promises that during employment with the Company, the Employee will not disclose any Business Secrets of the Company to any other person.
>
>          (b) Employee promises that Employee shall not take from the business premises of the Company or in any way convert to Employee's own use the Company's books, lists, files, computer software, computer disks or other storage of data or record, records or documents or compilation of information of any kind (or copies, transcriptions, or other excerpts of the same) related in any way to the business of the Company, even if such materials would not be considered Business Secrets. Employee also promises that, upon termination of employment, Employee shall surrender all such material to the Company but Employee may retain copies of items which relate solely to Employee's personal affairs, and copies of any items which are publicly available or generally available to those in the trade (but not to [sic] the originals of such documents which are and shall remain the property of the Company).
>
> 4.      If Employee's employment with the Company is terminated, the Employee may establish or accept employment with a competing private security business and may compete with the Company or aid the competing business to compete with the Company. However, upon the termination of Employee's employment with the Company, for any reason whatsoever and at any time, regardless of whether the Company has complied with its obligations to Employee, Employee promises that for one (1) year after the date of termination of employment, that the Employee will comply with the following limitations:

---

his responsibility, but the Court nonetheless finds that Sawyer too engaged in the development of new business and new clients.

(a) Employee shall not for himself or for another solicit or aid any other person to solicit any person who is a client of the Company at the time of termination or who has been a client at any time within 180 days prior to termination either to terminate the client's private security business services relationship with the Company for a project located in the Territory, or to purchase private security business services from Employee or from another for any other project in the Territory. This promise applies to any client or former client (if it is a former client I do not believe this should apply) [sic] only if the Employee had contact with such client during the Employee's employment with the Company or had administrative responsibility for the Company's relationship with that client while Employee was employed by the Company.

(b) Employee shall not solicit or aid any other person to solicit any person who is at the time Employee's employment is terminated, or who has been at any time within 180 days prior to termination, in negotiations with the Company for private security business services or to whom the Company had submitted a proposal for such services or received a request for proposal for such services within that time, for a project located in the Territory, to select the competing services of Employee or any other provider of private security business services for that project. This promise applies only if the Employee had contact with the person solicited while employed by the Company as part of the Employee's performance of the Employee's duties or if the Employee participated in the negotiations with such person or in the development of the Company's proposal or the response by the Company to a request for a proposal by such person, or if the Employee has administrative responsibilities in connection with the proposal or response or its preparation.

(c) Employee shall not solicit or aid a competing provider of private security business services to solicit any person who is employed by the Company at the time Employee's employment is terminated, to terminate that person's employment the Company [sic] and to accept employment with a competing provider of private business security services within the Territory.

(d) Employee will not disclose and will not use for himself or any other person any Business Secrets of the Company in order to solicit or aid any private security services business to solicit any person to purchase private security business services for a project located in the Territory.

(Pl.'s Ex. 5.)

There is no dispute that Sawyer submitted notice of his resignation from ISMG on or about March 24, 2006. He was requested and agreed to stay on an additional three weeks beyond that date to assist with the transition of his duties to the new manager. His last day with ISMG was April 13, 2006, though he was paid through April 15, 2006.

Sawyer began contemplating leaving ISMG no later than the end of January 2006. Sawyer and his new business partner, Rob Cesternino, both testified that they did not begin discussing the possibility of going into business for themselves until early March 2006. They moved quickly once these talks began, however, as Cesternino filed Articles of Incorporation for the new company, Defendant Citadel Security Services, on March 17, 2006, naming Cesternino as the registered agent for service of process and providing Sawyer's

4

home address as the service address. Robert Cesternino is himself a former employee of ISMG and is currently employed as Vice President of Operations for Star Protection Agency, based outside of Seattle, Washington.[2]

There is no dispute that Sawyer, while still employed by ISMG during the fall of 2005, e-mailed to Cesternino information and documents that ISMG characterizes as confidential and proprietary information belonging to ISMG, including: a copy of ISMG's Nashville Master Client Proposal; the Nashville Master Client Information Packet; "Strengths of ISMG New Prospective Clients"; and ISMG's corporate pricing program; as well as copies of corporate compliance audits for the Nashville branch; numerous e-mails by and between ISMG management employees containing confidential business information; a copy of the proposed lease for ISMG's office space in Nashville; and 2006 projected sales expectations for ISMG. ISMG has submitted a copy of an e-mail from Sawyer to Cesternino dated November 3, 2005, enclosing five different ISMG documents that ISMG alleges contain confidential and proprietary information. In the e-mail communication itself, Sawyer simply stated: "Could be a little useful!!" (See Complaint, Ex. C.) Cesternino and Sawyer testified that the context of this exchange was that Sawyer and ISMG were not satisfied with the level of business growth in the Tennessee/Kentucky market, and Sawyer was looking to Cesternino, as his friend and mentor, for marketing advice. He forwarded ISMG documents to Cesternino for his review and suggestions for possible improvements. Cesternino and Sawyer both testified that they had no intention of using these ISMG documents in the development of forms and procedures for Citadel.

During his employment, Sawyer had substantial contact with existing client contacts for ISMG, including various property managers and supervisors at Colliers Turley Martin Tucker ("Colliers"). Colliers does not actually own any of the buildings that it manages, but its employees function as agents for the different building owners with respect to the specific properties they manage. Specifically, Colliers employees are generally authorized to act as agents for the building owners for the purpose of entering into security services contracts. One question at issue in this case, which will be discussed below, is whether Colliers is itself a client or customer of ISMG, or, instead, whether the individual buildings or building owners for which ISMG provides services are the customers.

---

[2]Although Cesternino, like Sawyer, signed an employment agreement containing restrictive covenants while he was employed by ISMG, such covenants have long since expired, since Cesternino separated from ISMG in 2000.

5

One of the buildings for which Sawyer was actively pursuing a contract, prior to his departure from ISMG, was the Financial Center at 424 Church Street in Nashville ("Financial Center"). ISMG already has the security contract for the adjacent building, the SunTrust Bank Building on the corner of 4th Avenue and Church Street. Both buildings are managed by Colliers through different property managers employed by Colliers. Connie Carpenter is the Colliers employee who manages the SunTrust Bank Building. Carolyn Riddle is the Colliers employee who manages the Financial Center. Sawyer worked for nearly a year in developing a relationship with Carolyn Riddle in the hopes of securing, on behalf of ISMG, the security services contract for the Financial Center through her.

Specifically, Riddle and Sawyer originally became acquainted as a result of their participation in BOMA, a trade group for real estate management professionals. In October 2005, Riddle made it known to Sawyer that she was interested in hiring a new security services company for the Financial Center, but she was concerned about maintaining a couple of the specific guards employed at that building. To assist her in putting together a Request For Proposal ("RFP"), since she had not done one for security services before, Sawyer sent to Riddle a book of 5 or 6 different sample RFPs. Riddle selected the one she preferred, and Sawyer then assisted her in tailoring it to fit the Financial Center's needs. (See Pl.'s Exs. 1, 2, 3.) The RFP Riddle ultimately issued in April 2006 was almost identical to the one Sawyer prepared for her in the fall of 2005.

In January 2006, Riddle and Sawyer exchanged communications about meeting to discuss ISMG's bid for security services at the Financial Center. Specifically, in response to Sawyer's proposal that they meet for lunch one day soon, Riddle responded: "There are some changes in security here at the building. We have two of our guards leaving, one is retiring and one got a better paying job closer to his home, so it is a perfect time to get the bid out." (Pl.'s Ex. 4.)

While there was no testimony regarding whether Sawyer made an actual oral "bid" for the security services contract at the Financial Center while he was still employed by ISMG, there is no doubt that Riddle knew Sawyer wanted the contract for ISMG and that ISMG was in the running for the contract, at least while Sawyer was still employed by ISMG. Further, Sawyer clearly was charged by ISMG to procure that contract. In early 2006, Sawyer submitted to his superiors at ISMG a "Proposal Log" that purported to track business activity for the company. In that log, Sawyer indicated that a proposal had actually been delivered to the

6

Financial Center and was pending. (Pl.'s Ex. 6.) Sawyer testified that the notation that the Financial Center contract was pending was simply an "error" on his part, and Riddle testified that Sawyer never delivered a formal proposal on behalf of ISMG.

Notwithstanding, on April 10, 2006, while Sawyer was still employed by ISMG but after he had given notice of his resignation, he and Cesternino put on a presentation for Colliers employees to discuss the services their new company was going to provide. According to Cesternino, Citadel's focus was going to be on patrol services, a service ISMG does not currently offer in Nashville or the Tennessee/Kentucky market as a whole. However, when asked by one of the Collier employees who attended the presentation if Citadel would also provide guard services, Cesternino replied that it certainly would. Sawyer took a day off work from ISMG to participate in the presentation to Colliers.

Sawyer's last day with ISMG was Thursday, April 13, 2006. On Monday, April 17, 2006, Riddle issued an RFP for security services at the Financial Center. She submitted the RFP to Citadel and to three other companies offering private security services. She did not submit an RFP to ISMG. Riddle testified that if Sawyer had still been at ISMG, she would have submitted an RFP to ISMG. She further testified that for her, Sawyer is the face of ISMG.

Cesternino prepared the proposal submitted by Citadel in response to Riddle's RFP. Defendants initially maintained that Cesternino did not use or rely in any way upon any forms or documents developed by ISMG in preparing the proposal. Testimony elicited at the hearing indicated, however, that the proposal incorporated information about Nashville bill rates and pricing information which Sawyer provided. Sawyer also supplied a list of "References," which includes the property managers and client contacts for current properties for which ISMG provides security services. ISMG maintains that the pricing information is confidential and proprietary business information which Sawyer wrongfully disclosed to Cesternino and Citadel, and that the use of ISMG's clients as references constitutes a theft of the goodwill developed in the Nashville market by ISMG.

At any rate, Cesternino submitted the proposal to Riddle, and announced her decision to award the contract to Citadel on or around April 28, 2006. On May 3, Citadel began advertising in the Tennessean for managers and guards to staff this contract. While the advertisement directs potential applicants to Cesternino, Cesternino testified that after reviewing and screening the resumes submitted, he directed

7

qualified applicants to Sawyer, who performed the initial round of interviews. More than one of the applicants in the pool are current employees of ISMG. Sawyer testified that, although he interviewed the current ISMG employees, he had not as of the hearing date offered any of them employment at Citadel.

## II.     PROCEDURAL BACKGROUND

Judge Haynes issued a TRO granting the relief requested in paragraphs 1, 2, and 3 on page 2 of Plaintiff's Emergency Application For a Temporary Restraining Order, and numbers 4 and 5 except that the restraint pertained to existing clients of ISMG and to Colliers, but did not apply to any other "prospective" clients. (See Doc. No. 10.) Specifically, the TRO:

> (1) Prohibits Defendants from destroying documents, materials, information or other property, including electronically stored information that is related to the subject matter set forth in ISMG's Verified Complaint, including but not limited to any property belonging to ISMG;
>
> (2) Requires Defendants to immediately return any property of ISMG in Defendants' possession, custody or control, including electronically stored information;
>
> (3) Prohibits Defendants from disclosing or making use of any Business Secrets of ISMG, as that term is defined in the March 22, 2005 agreement between ISMG and Defendant Sawyer; and
>
> (4) Restrains Defendants from soliciting or performing security services for any existing ISMG client with which Defendant Sawyer had contact or administrative responsibility while employed by ISMG, or for any building in the Tennessee/Kentucky market managed by Colliers Turley Martin Tucker.

(See Doc. Nos. 2 and 10.)

The parties have not submitted any arguments with respect to No. 1; the parties agree that Defendants have complied with No. 2 in that they have gathered and retrieved any and all electronic and hard copies of any documents in their possession relating to ISMG, and have delivered all original versions and copies of those documents to their counsel of record, who conveyed them to ISMG's counsel.

ISMG now seeks to convert the remaining proscriptions contained in the TRO into a preliminary injunction. In addition, ISMG also argues that it is entitled to a preliminary injunction barring Defendants from soliciting current ISMG employees in violation of the Employment Agreement.

## III.    ANALYSIS AND DISCUSSION

A preliminary injunction is "an extraordinary and drastic remedy" which should be granted with great caution. Mazurek v. Armstrong, 520 U.S. 968, 972 (1997) (citation omitted). The decision whether to issue a preliminary injunction lies within the sound discretion of the district court. The factors to be considered in

8

determining whether to issue a preliminary injunction include: "(1) the likelihood that the party seeking the preliminary injunction will succeed on the merits of the claim; (2) whether the party seeking the injunction will suffer irreparable harm without the grant of the extraordinary relief; (3) the probability that granting the injunction will cause substantial harm to others; and (4) whether the public interest is advanced by the issuance of the injunction." United States v. Edward Rose & Sons, 384 F.3d 258, 261 (6th Cir. 2004) (quoting Washington v. Reno, 35 F.3d 1093, 1099 (6th Cir. 1994)). These are factors to be balanced, not prerequisites that must be met. Id. While no single factor will be determinative as to the appropriateness of the equitable relief sought, In re DeLorean Motor Co., 755 F.2d 1223, 1229 (6th Cir. 1985), "a finding that there is simply no likelihood of success on the merits is usually fatal." Gonzales v. Nat'l Bd. of Med. Exam'rs, 225 F.3d 620, 625 (6th Cir. 2000) (citation omitted). The purpose of a preliminary injunction is simply to preserve the status quo; thus, findings of fact and conclusions of law made by a district court in granting a preliminary injunction are not binding at a trial on the merits. Univ. of Tex. v. Camenisch, 451 U.S. 390, 395 (1981). Under Rule 52 of the Federal Rules of Civil Procedure, a district court is required "to make specific findings concerning each of these four factors, unless fewer are dispositive of the issue." DeLorean Motor Co., 755 F.2d at 1228.

With respect to the first factor, a plaintiff "must show more than a mere possibility of success" on its substantive claims in order to establish a likelihood of success on the merits; "[h]owever, it is ordinarily sufficient if the plaintiff has raised questions going to the merits so serious, substantial, difficult, and doubtful as to make them a fair ground for litigation and thus for more deliberate investigation." Six Clinics Holding Corp., II v. Cafcomp Sys., Inc., 119 F.3d 393, 402 (6th Cir. 1997) (citations omitted).

The second factor to be considered has been identified by the Sixth Circuit as "irreparable harm that could result if the injunction is not issued." See Basicomputer Corp. v. Scott, 973 F.2d 507, 511 (6th Cir. 1992). As a general rule, a plaintiff has not established irreparable harm where damages would adequately compensate it for the asserted harm. See id. If the total damages associated with a plaintiff's loss would be difficult to calculate, then plaintiff's injury would not adequately compensate plaintiff for its injury. Under such circumstances, injunctive relief would be appropriate. Id. The loss of customer goodwill often amounts to irreparable injury because the damages flowing from such losses are difficult to compute. Id. (citations omitted); see also AmeriGas Propane, Inc. v. Crook, 844 F. Supp. 379, 390 (M.D. Tenn. 1993). Similarly,

the loss of fair competition that results from the breach of a non-competition covenant is likely to constitute irreparable harm to an employer. Id. (citations omitted).

The third factor the Court must consider is whether enforcement of the injunction will cause "substantial harm" to others. Leary v. Daeschner, 228 F.3d 729, 736 (6th Cir.2000). This requires a court to balance the harm a plaintiff would suffer if its request for a preliminary injunction was denied with the harm the defendants would suffer if they were to be preliminarily enjoined. It also requires a court to assess the impact a preliminary injunction might have on relevant third parties. Corporate Exp. Office Products v. Warren, 2002 WL 1901902, at *27 (W.D.Tenn. May 24, 2002).

Finally, the somewhat nebulous fourth factor requires to court to consider whether entry of an injunction will serve the public interest by, for example, promoting stability and certainty in business and employment relationships. See, e.g., AmeriGas Propane, 844 F. Supp. at 390.

Here, ISMG seeks injunctive relief against Defendants arising out of Sawyer's alleged misappropriation of trade secrets, unfair competition, breach of loyalty, breach of contract, intentional interference with business relations, and violation of the Computer Fraud and Abuse Act. With respect to the claims for breach of loyalty, breach of contract and intentional interference with business relations, the relief sought is the same: ISMG seeks to enjoin Defendants from contracting with the Financial Center for the provision of private security services. Each of these claims will nonetheless be analyzed individually in light of the factors outlined above.

### A.     Misappropriation Of Trade Secrets and Unfair Competition

#### 1.     *Likelihood Of Success On the Merits*

The elements of a claim under Tennessee law for misappropriation of a trade secret are: (1) the existence of a trade secret; (2) communication of the trade secret to the defendant while in a position of trust and confidence; (3) defendant's use of the communicated information; and (4) resulting detriment to the plaintiff. See Hickory Specialties, Inc. v. B & L Labs, Inc., 592 S.W.2d 583, 586 (Tenn. Ct. App. 1979). Moreover, Tennessee courts have recognized that an action for unfair competition may be sustained for breach of a fiduciary relationship by an employee who uses confidential information to the employer's detriment. See, e.g., B & L Corp. v. Thompson & Thorngren, Inc., 162 S.W.3d 189, 215 n.7 (Tenn. Ct. App. 2004) (recognizing unfair competition tort arising out of unlawful use of confidential information).

10

ISMG claims that it will be able to establish each of these elements at a trial on the merits and has presented evidence regarding the confidential nature of the information at issue and the steps ISMG took to maintain its trade secret status. Defendants do not seriously contest the question of whether the information at issue constitutes trade secrets and, in any event, as discussed briefly below, Sawyers was contractually bound not to disclose any proprietary information, regardless of whether it could properly be characterized as trade secrets. Further, there is no dispute that he did in fact disclose proprietary information to Cesternino and others outside ISMG. The real question is whether Defendants used the information to ISMG's detriment.

Based upon their demeanor at the hearing, the Court credits Cesternino's and Sawyer's testimony to the effect that Sawyer forwarded various ISMG documents to Cesternino in the Fall of 2005 with the intent to request his input and suggestions as to how to improve the documents and so that he could, in exchange, compare them with the forms Cesternino used in the security services company for which he worked on the west coast. Further, Defendants presented proof that the marketing documents and forms generated thus far by Citadel, as well as the proposal submitted to the Financial Center, are for the most part not based upon ISMG's. Sawyer has conceded, however, that he and Cesternino have put to use certain pricing information obtained from ISMG, and that they used ISMG clients as "references" on Citadel's proposal. Sawyer, in fact, agreed in open court to remove these references from any future proposals to be submitted by Citadel. Consequently, the Court finds that ISMG has demonstrated a substantial likelihood of success on its claims for misappropriation of trade secrets or unfair competition based upon Sawyer's concessions.

### 2. The Possibility Of Irreparable Harm

As set forth above, Sawyer admitted to using ISMG clients as references on Citadel's proposal and to providing certain pricing information from the Nashville market, which Cesternino incorporated into the Financial Center proposal. ISMG has reasonably demonstrated that the total damage to its goodwill associated with defendants' continued use of ISMG's proprietary information and references would be difficult to calculate. The Court finds that a strong possibility of irreparable harm exists with respect to these claims.

### 3. The Risk Of "Substantial Harm" To Others

In balancing the risk of harm to the Defendants if an injunction is imposed with the risk of harm to ISMG if one is not, the Court finds that the risk of harm to Defendants resulting from the relatively limited

nature of an injunction barring Defendants from doing what they have already agreed not to do, is slight. The risk of harm to relevant third parties, namely Cesternino or potential clients of Citadel, is even smaller.

### 4.    Whether "Public Interests" Will Be Advanced

Companies such as ISMG have a legitimate public interest in keeping certain information confidential and in maintaining their clientele, and Tennessee has recognized that businesses have the right to protect their confidential and trade secret information as well as their business good will. The court finds that no public interest will be disserved if a preliminary injunction is granted with respect to this particular cause of action.

### 5.    Balancing All the Factors

Each of the relevant factors weighs in favor of entry of a preliminary injunction prohibiting further use or disclosure of certain of ISMG's confidential and/or proprietary business information.

### B.    Breach Of Loyalty

### 1.    Likelihood Of Success On the Merits

Under Tennessee common law, the duty of loyalty imposes upon an employee an obligation to act solely for the benefit of the employer in matters within the scope of his employment during the course of his employment. Thus, an employee should not compete with his employer while still employed, regardless of whether an actual noncompetition agreement exists. <u>Knotts Wholesale Foods, Inc. v. Azbell</u>, 1996 WL 697943, at * 3 (Tenn. Ct. App. Dec. 6, 1996) (citing 27 Am. Jur. 2d, <u>Employment Relationship</u> § 216; <u>Restatement (Second) of Agency</u> § 393). An act that constitutes a breach of loyalty is considered the act of a "traitor" and is "most often [an] intentional, destructive act completed explicitly for the employee's own self-interests, in direct violation [of] or competition with the interests of an employer." <u>Booth v. Fred's, Inc.</u>, 2003 WL 21998410, at *13 (Tenn. Ct. App. Aug. 19, 2003).

ISMG characterizes Sawyer's contacts with Cesternino and Gary Conrad beginning in August 2005 through the date of his termination in April 2006 as instances of breach of loyalty. The Court finds that, at a minimum, the meeting between Sawyer and Cesternino with Colliers representatives, conducted on April 10, 2006 for the purpose of introducing Colliers agents to Citadel and the services it would be providing, constituted an instance in which Sawyer breached his duty of loyalty to ISMG, regardless of whether he had taken that day off of work from ISMG. In addition to that instance, there is significant evidence in the record

12

from which a jury could readily conclude that Sawyer began courting Carolyn Riddle on behalf of Citadel, rather than on behalf of ISMG, prior to his departure from ISMG, given that Riddle's RFP for security services at the Financial Center was issued to Citadel two days after Sawyer's employment with ISMG officially ended, with only a weekend in between.

As Defendants point out, an employee does not breach a duty of loyalty to his employer by making preparations to compete while still employed, for instance by filing a corporate charter for a new competing company. Cf. Venture Express, Inc. v. Zilly, 973 S.W.2d 602, 606 n.2 (Tenn. Ct. App. 1998). He may also, while still employed, inform current or potential clients of the company that he intends to leave and what his future plans are without breaching any duty of loyalty. See, e.g., Baker v. Battershell, 1986 WL 7602, at *3 (Tenn. Ct. App. July 0, 1986). The behavior of Sawyer in putting on a presentation on behalf of his new company while still employed by ISMG, however, went beyond merely preparing to compete.

The Court concludes that ISMG has demonstrated a substantial likelihood of success on the merits in proving its claim for breach of the duty of loyalty.

### 2. The Possibility Of Irreparable Harm

While ISMG has demonstrated a substantial likelihood of success on the merits of its breach of loyalty claim, that claim arises from acts committed by Sawyer while he was still employed by ISMG, which is no longer the case. While the damages already caused by such breach of loyalty may be difficult to calculate, entry of an injunction at this juncture would not have the effect of preventing future damages, nor would it make proof of damages any easier. This factor therefore does not weigh in favor of entry of an injunction.

### 3. The Risk Of "Substantial Harm" To Others

The risk of damage to Defendants resulting from entry of an injunction barring them from going forward with finalizing and performing the Financial Center contract is much higher than the relative harm that ISMG would suffer if the requested injunction is not entered. The testimony at the hearing strongly suggested that preventing Citadel from performing the contract would not be likely to enable ISMG to step into Citadel's shoes and perform the contract instead. The Financial Center would also be further inconvenienced. This factor does not weigh in favor of granting the injunction

### 4. Whether "Public Interests" Will Be Advanced

13

The only public interest that would be advanced by entry of an injunction would be the punitive effect such an injunction would have upon Citadel. While the tort of breach of loyalty is not condoned by business practices or the courts, neither is punishment simply for the sake of punishment warranted.

### 5.     *Balancing All the Factors*

Despite the fact that ISMG has demonstrated a strong likelihood of success on the merits of its claim for breach of loyalty, it is not clear to what extent ISMG suffered damages resulting specifically from that breach of loyalty, as distinct from injury suffered merely as a result of Sawyer's departure. Moreover, the remaining factors do not weigh in favor of entry of a preliminary injunction barring Defendants from finalizing and performing the contract for the provision of private security services at the Financial Center.

### C.     Breach Of Contract

#### 1.     *Likelihood Of Success On the Merits*

The basic elements of a claim for breach of contract in Tennessee are (1) the existence of an enforceable contract; (2) breach of that contract; and (3) damages that flow from that breach. LifeCare Ctrs. Of Am., Inc. v. Charles Town Assocs. Ltd. P'ship, LPIMC, 79 F.3d 496, 514 (6th Cir. 1996). In addition, "there is implied in every contract a duty of good faith and fair dealing in its performance and enforcement." TSC Indus., Inc. v. Tomplin, 743 S.W.2d 169, 173 (Tenn. Ct. App. 1987). This duty extends to the performance and enforcement of employment contracts. Hooks v. Gibson, 842 S.W.2d 625, 628 (Tenn. Ct. App. 1992). This duty of good faith and fair dealing means that the parties to an employment contract are bound "to act in word and deed, in a responsible manner." Williams v. Maremont Corp., 776 S.W.2d 78, 81 (Tenn. Ct. App. 1989) (citing Gibson's Suits In Chancery, 6th Ed. § 23).

Generally speaking, an agreement in restraint of trade, such as the Employment Agreement at issue here, is enforceable under Tennessee law so long as it is reasonable under the particular circumstances. Factors to be considered in determining an agreement's reasonableness include whether it is supported by adequate consideration; the threatened danger to the employer in the absence of such an agreement; the economic hardship imposed on the employee by such a covenant; and whether or not such a covenant would be "inimical to public." Allright Auto Parks, Inc. v. Berry, 409 S.W.2d 361, 363 (Tenn. 1966).

As suggested above, it is clear that Sawyer breached Paragraph 3(b) of the Employment Agreement by conveying company information to persons outside ISMG. Because it appears that Sawyer has now

returned any documents and files he initially failed to return to ISMG, and because the issue of the use of ISMG's information for the benefit of Citadel is addressed in the section concerning the claim for misappropriate of trade secrets/confidential information, above, the Court will not dwell on this point here.

Apart from that issue, the parties's breach-of-contract dispute is focused upon the provisions of the Employment Agreement barring solicitation of current or prospective customers of ISMG, and barring solicitation of current employees of ISMG.

(a) <i>Contract Provision Barring Solicitation Of Current or Prospective Customers</i>

ISMG argues that the contract expressly prohibits Sawyer from soliciting current clients of ISMG's for a period of one year after his termination, and that Colliers itself is a current client, such that Sawyer, and Citadel, are barred from soliciting contracts at any building in the Tennessee/Kentucky region managed by Colliers. In the alternative, ISMG argues that the Employment Agreement also bars the solicitation of prospective clients, as that concept is narrowly defined in the Agreement itself, and that the Financial Center specifically met that definition of a prospective client prior to Sawyer's departure from ISMG. Thus, ISMG argues, regardless of whether Colliers or the buildings themselves are considered to be the "client," Sawyer, both individually and through Citadel, has breached the non-solicitation provision by soliciting a security services contract with the Financial Center specifically.

In response, Defendants argue that (1) to interpret the Employment Agreement as barring solicitation of any building in the relevant region managed by Colliers renders it unenforceably broad; (2) ISMG has no protectable interest in mere potential or prospective clients; and (3) even if it does, the Financial Center does not meet the contract definition of prospective client.

Each of these arguments is addressed below.

i.     Enforceability Of Prohibition Against Soliciting Current Clients

In support of its first argument—that Colliers should be considered a current client—ISMG points to the following facts: (1) Colliers is the property management company that manages both the SunTrust Bank Building, for which ISMG currently provides security services, and the Financial Center; and (2) the property manager is the party who solicit bids for security services, selects the security services contractor, and negotiates and administers the contract; (3) the property manager manages the property on behalf of the building owners; and (4) Sawyer himself, as demonstrated by a document entitled "Current Client Info. Page

for References," considers the property manager for the specific buildings to be the client contact.

In response, Defendants contend that the individual buildings or building owners are the "client," while Colliers is merely the property manager for different buildings owned by various different entities. The Financial Center is owned by Corac New Life General Partnership ("Corac") and managed by Carolyn Riddle for Colliers. The SunTrust Bank Building is owned by Nashville Office Associates, L.P. ("NOA") and is managed by Connie Carpenter for Colliers. The signatories to the contract for security services in the SunTrust Bank Building are its owner, NOA, and ISMG. Although the Colliers property manager executed the security services contract for the SunTrust building, she did so as the agent for and in the name of NOA and for its benefit. Similarly, Colliers executed the current contract for security services in the Financial Center with Guardsmark, Inc. as "agent" for its owner, Corac, in 2001. The RFP for security services at the Financial Center issued by Carolyn Riddle states: "Colliers Turley Martin Tucker, *in its capacity as managing agent for the owners of the Financial Center*, requests that you submit a proposal for the provision of Security Services at the property."

Basically, Defendants argue that ISMG is improperly trying to expand the scope of the limited "current- client" non-solicitation provision in the Agreement far beyond those buildings for which Plaintiff currently provides security services to include every building in this area that happens to be managed by Colliers. As Defendants point out, Colliers, according to its website, "manage[s] 140 million square feet of office, industrial and retail space" nationwide, and its Nashville office alone manages over ten million square feet of space. See www.colliers.com/Markets/Nashville. Defendants also argue that if ISMG had intended for the contract to be construed so broadly as to bar solicitation of any property managed by Colliers, it should have made that clear in the language of the agreement.

The Court agrees that restrictive covenants in employment agreements are to be strictly construed in favor of the employee, and that the employer as drafter of the agreement must "take responsibility for its allegedly ambiguous provisions." B & L Corp. v. Thomas & Thorngren, Inc., 917 S.W.2d 674, 678 (Tenn. Ct. App. 1995). See also Selox v. Ford, 675 S.W.2d 474, 476 (Tenn. 1984) ("Post-employment restraints are scrutinized with particular care because they are often the product of unequal bargaining power. . . . This is especially so where the restraint is imposed by the employer's standardized printed form." (citation omitted)). Further, there is no dispute that the SunTrust Bank Building is the only building managed by

Colliers in Tennessee or Kentucky for which ISMG provides security services. Reading the Employment Agreement to prohibit Defendants, for an entire year, from bidding for security services contracts at any other building in the Nashville/Kentucky market that happens to be managed by Colliers, regardless of whether ISMG has ever actively pursued a security services contract at those buildings, would render the Agreement so broad in scope as to be unenforceable. ISMG has no legitimate, protectable interest in preventing competition for services at buildings for which it has never provided services nor sought to provide services.

Consequently, the Court construes the "current-client" non-solicitation provision as barring Sawyer or Citadel, for a one-year period, from soliciting a contract or providing security services at any building for which ISMG was actually providing security services as of Sawyer's departure date. Construed this narrowly, the provision is reasonable and enforceable. Thus, Sawyer may be determined to have breached the Employment Agreement with respect to soliciting the Financial Center only if ISMG has a legitimate interest in protecting its relationship with prospective clients *and* if the Financial Center qualifies as such a prospective client.

ii.       Enforceability Of Prohibition Against Soliciting "Prospective Clients"

In support of their argument that ISMG has no protectable interest in preventing solicitation of potential or prospective customers, Defendants cite to the unreported case of Vaughn v. Weems, 1994 WL 681158 (Tenn. Ct. App. Dec. 7, 1994), in which the defendant/employee signed a nonsolicitation agreement providing that he would not "directly or indirectly, alone or with others, solicit or attempt to solicit" business from any current customer or any entity that "had been solicited as a potential customer" during the employee's employment with the plaintiff. Id. at *1. Besides finding the temporal reach of that provision unreasonable insofar as it purported to bar solicitation of any potential client solicited during the entire term of the defendant's lengthy employment, the Tennessee Court of Appeals also held that the prohibition pertaining to *potential* clients generally was unenforceable. As the court stated, "Unarguably, *present* customers are a protectable interest of the employer. However, extending this covenant to include any solicited potential customer is inimical to the public interest and unreasonable." Id. at *3 (citations omitted); cf. Thompson, Breeding, Dunn, Creswell & Sparks v. Bowlin, 765 S.W.2d 743, 745 (Tenn. Ct. App. 1988) ("Although the term 'clients' in the Contract was not specifically limited to present clients, we find that this is the only defendable client interest the Partnership had.").

17

The specific provision at issue in the case at bar pertaining to potential clients prohibits an employee who leaves ISMG from soliciting any person "who has been at any time within 180 days prior to termination, in negotiations with [ISMG] for private security business or to whom [ISMG] had submitted a proposal for such services or received a request for proposal for such services within that time, for a project located in the Territory." (Pl.'s Ex. 5, ¶ 4(a) & (b).) This provision is clearly much narrower in scope than those provisions pertaining to "potential" clients that other courts have previously held to be unreasonable under Tennessee law. The provision at issue here pertains to a very narrow range of easily identifiable prospective clients with which ISMG had been in active negotiations within the six months prior to the employee's termination. The Court therefore predicts that Tennessee courts would uphold this provision as sufficiently narrow in scope to be considered reasonable and enforceable.

### iii. Whether the Financial Center Was a "Prospective Client"

The next issue then is whether Defendant Sawyer has actually breached the provision at issue by soliciting, on behalf of Citadel, the security services contract at the Financial Center. Resolution of this issue depends upon whether the Financial Center qualifies as a *prospective* client in which ISMG has a protectable interest under the Employment Agreement. In arguing that the Financial Center does not meet that definition, Defendants point out that Carolyn Riddle never submitted a formal RFP to ISMG for security services at the Financial Center; ISMG never submitted a formal proposal for the provision of such services; and Riddle and Sawyer (on behalf of ISMG) never actively engaged in negotiations regarding the terms of a security services contract for the Financial Center. ISMG, on the other hand, points out that in October 2005, well within 180 days prior to his termination, Sawyer, on behalf of ISMG, was communicating with Riddle about the possibility of ISMG's providing security services for the financial center. Indeed, in October 2005, Sawyer assisted Riddle in selecting the form for the RFP she would eventually issue to various contractors requesting bids for security services, and then revised the form for her to tailor it for use by the Financial Center. On October 27, 2005, Sawyer forwarded to Riddle, at her request, a Request for Proposal he had prepared for her to use, and which was basically identical to the RFP Riddle ultimately issued in April 2006.

In January 2006, Sawyer sent a document via electronic mail to his superior at ISMG in which he identified the Financial Center as a proposal that he intended to deliver within 120 days, and that he was going to get together with Carolyn Riddle the following week to discuss this matter. Later in the month,

Sawyer and Riddle exchanged e-mails about meeting for lunch. The context of the e-mails clearly suggests that the purpose of the meeting was to discuss ISMG's prospects as the Financial Center's next security services provider. Shortly thereafter, Sawyer prepared a bid proposal log indicating that as of February 6, 2006, he had delivered a bid proposal to Riddle for the Financial Center and that this bid was pending. This log was given to one of Sawyer's superiors at ISMG, who used it to track the status of the company's sales. In other words, as ISMG insistently points out, Sawyer represented to ISMG well within 180 days of his termination that he was not only engaged in negotiations on ISMG's behalf for the Financial Center contract, but that he had already drafted and delivered a proposal to Riddle.

It is simply beyond dispute that Sawyer was actively courting Riddle for the Financial Center contract during the 180 days prior to his termination. Although Riddle did not submit a formal RFP to ISMG and ISMG apparently never submitted a formal written proposal for services, the Court nonetheless finds the evidence sufficient to establish that Sawyer and Riddle were actively in negotiations for that contract within the definition of the Agreement and, therefore, that Sawyer breached the Employment Agreement provision barring solicitation of prospective clients when he later persuaded Carolyn Riddle to select Citadel to provide security services at the Financial Center.

*(b)      Contract Provision Barring Solicitation Of Current ISMG Employees*

Paragraph 4(c) of the Employment Agreement states:

> Employee shall not solicit or aid a competing provider of private security business services to solicit any person who is employed by the Company at the time Employee's employment is terminated, to terminate that person's employment [with] the Company and to accept employment with a competing provider of private business security services within the Territory.

There is no dispute that an advertisement for Citadel was placed in the Tennessean. That advertisement did not mention Sawyer's name and applicants initially were put in contact with Cesternino. Cesternino, after an initial screening of the resumes, directed the applicants to follow up with Sawyer. Sawyer actually conducted interviews of the various applicants. Defendants concede that more than one ISMG employee responded to the advertisement and were interviewed by Sawyer. According to Defendants, no current ISMG employee has been offered a position with Citadel.

The Court is again presented with a two-fold question. First, does ISMG have a protectable interest in limiting Sawyer's ability to solicit current employees to come work at his new company? And second,

assuming so, has Sawyer breached that restraint by conducting interviews of the applicants, including the current ISMG employees?

i.      Enforceability Of the Employee-Solicitation Provision

According to Defendants, the Tennessee Supreme Court has stated that "the loss of employees to competitors is the type of injury which results from ordinary competition and which cannot be restrained by contract." Hasty v. Rent-A-Driver, Inc., 671 S.W.2d 471, 474 (Tenn. 1984). In fact, Hasty does stand for the proposition that an employer "cannot by contract restrain ordinary competition." Id. The restraint in that case purported to prevent an employee truck driver from going to work for any client to which he had previously been assigned by the Defendant, his former employer. That case did not address the solicitation of current employees by a former employee.

In fact, the Court is not aware of any Tennessee case law specifically addressing this question, but it nonetheless appears that Tennessee courts have enforced similar provisions. See, e.g., Internation Mktg. Group, Inc. v. Speegle, 2000 WL 329375, at *3 (Tenn. Ct. App. Mar. 30, 2000) (affirming the trial court's decision to enforce a restrictive covenant prohibiting solicitation of current employees, and affirming damages judgment against defendants for $13.5 million dollars for injuries resulting from defendants' "stripp[ing] [plaintiff] of more than one half of its former sales force and almost half of its customers"). Courts applying the law of other states have upheld similar provisions. See, e.g., Robert Half Intern., Inc. v. Van Steenis, 784 F. Supp. 1263, 1274–75 (E.D. Mich. 1991) (applying Michigan law, entering a permanent injunction specifically enforcing a provision in an employment agreement that prohibited defendant from "solicit[ing], induc[ing], or attempt[ing] to induce any other employee of the Plaintiff to leave its employ to become connected in any way with, or employ any such employee in, any other executive recruiting firm, employment agency or temporary personnel service business"); Benfield, Inc. v. Moline, 351 F. Supp. 2d 911, 920 (D. Minn. 2004) (applying Minnesota law, granting preliminary injunction prohibiting defendants from, among other things, soliciting plaintiff's employees to work at their new company).

The Court finds that ISMG has a protectable interest in maintaining its current employees, and that the non-solicitation provision is narrowly enough drawn to protect that interest without encroaching upon the rights of the individual employees to be employed where they choose. The Court concludes that a Tennessee court confronted with the provision at issue would conclude that it is enforceable.

20

ii.    Alleged Breach Of the Employee Solicitation Provision

The next issue is whether Sawyer has actually breached the provision at issue.  Merriam-Webster defines "solicit" as follows:

1 a : to make petition, to entreat; b : to approach with a request or plea
2 : to urge (as one's cause) strongly
3 a : to entice or lure especially into evil b : to proposition (someone) especially as or in the character of a prostitute
4 : to try to obtain by usually urgent requests or pleas

See http://www.merriam-webster.com/dictionary/solicit.  Similarly, Black's Law Dictionary defines solicitation as "the act or an instance of requesting or seeking to obtain something; a request or petition."  Black's Law Dictionary 1427 (8th ed. 2004).

The conduct in question includes the placement of the advertisement in the newspaper, and then conducting interviews of potential candidates.  While merely placing a neutral advertisement in the newspaper, requesting applications, does not in and of itself fit the definitions of "solicit" as set forth above, conducting an interview after potential candidates respond to the ad might well constitute solicitation.  There is no evidence before the Court regarding the actual content of the interviews, other than the fact that no job offers were extended to any current ISMG employees.  The extension of a job offer alone would qualify as solicitation, as it constitutes "an instance of requesting or seeking to obtain something."  Id.  Even if no job offer were made, however, depending upon how Sawyer went about describing the benefits of working for Citadel and in particular whether any unfavorable comparisons with ISMG were made, the interviews conducted by Sawyer might conceivably be characterized as solicitation regardless of whether a job offer was extended.[3]

Because there is no evidence that a job offer was extended and no other evidence whatsoever

---

[3]The Court notes that other courts presented with this same issue have gone both directions in interpreting the scope of non-solicitation provisions.  Those courts finding non-solicitation provision unenforceable to the extent they go beyond prohibiting the former employee from *initiating* contact with current employees generally do so on the basis of state statutes barring agreements that act in restraint of trade.  See, e.g., Atmel Corp. v. Vitesse Semiconductor Corp., 30 P.3d 789, 793–94 (Colo. Ct. App. 2001) (based upon a state statute barring agreements that act in restraint of trade, finding co-employee non-solicitation provision "void and unenforceable to the extent it can be interpreted to prohibit those defendants from doing anything other than initiating contacts with [plaintiff's] employees."); Loral Corp. v. Moyes, 219 Cal. Rptr. 836, 843–44 (Cal. Dist. Ct. App. 1985) (finding a non-solicitation provision enforceable so long as it was constructed only to prohibit the defendant from initiating contact with his former co-employees, based upon a specific California statute).

Case 3:06-cv-00456   Document 25   Filed 06/06/06   Page 21 of 30 PageID #: 397

regarding the content of the interviews, the Court finds that there is insufficient evidence to determine that Sawyer has actually breached the employee non-solicitation provision. However, the evidence is clear that Sawyer intended to do so by interviewing current ISMG employees with the possibility of extending job offers to ISMG employees.[4]

### 2.    *The Possibility Of Irreparable Harm*

With respect to the first issue, as discussed above in the context of the discussion regarding breach of loyalty, any harm that can accrue to ISMG as a result of Sawyer's solicitation of the Financial Center contract for Citadel has already occurred and, in fact, likely occurred simply by virtue of Sawyer's leaving ISMG, as Carolyn Riddle clearly testified that Sawyer was, for her, the face of ISMG, and she does not have (and apparently does not desire to have) any relationship with Sawyer's former colleague at ISMG, Asa Helton. An injunction barring Citadel from providing security services at the Financial Center is not likely to cause further irreparable harm, since, as counsel for ISMG himself recognized, Carolyn Riddle is unlikely to award the contract to ISMG even if Citadel steps out of the picture.

As for the employee-solicitation issue, it is unlikely that ISMG has actually incurred damages resulting from the purported solicitation, since Citadel, as of the date of the hearing at least, had not offered jobs to any current ISMG employees. However, it will be difficult to quantify the damages ISMG may incur if Sawyer continues to interview current ISMG employees and proceeds to offer them employment with Citadel. Moreover, because Sawyer was, prior to his resignation, the highest ranking employee in ISMG's Nashville office, it is highly likely that many of the employees in that office have developed strong relationships with Sawyer and consider Sawyer to be the "face" of ISMG. Failure to enforce this provision would give Sawyer an advantage over ISMG in luring ISMG employees away, which risk ISMG specifically sought to minimize by including the bar against soliciting current employees in its Employment Agreement. Thus, likelihood of irreparable harm is relatively high in this regard.

### 3.    *The Risk Of "Substantial Harm" To Others*

For the same reasons outlined under the discussion of breach of loyalty, this factor does not weigh

---

[4]The Court recognizes that Sawyer did not have the intent to breach the Employment Agreement *per se*, but he did intend to interview current ISMG employees, which the Court finds may constitute breach on the non-solicitation provision in the Employment Agreement.

in favor of entry of an injunction prohibiting Citadel from performing the Financial Center contract. It does, however, weigh slightly in favor of granting the injunction to prohibit solicitation of current ISMG employees.

#### 4. Whether "Public Interests" Will Be Advanced

Again, companies generally have a legitimate public interest in maintaining current employees in whom they have invested substantial time and funds in training. In addition, Tennessee has a strong public policy in favor of upholding contracts. See AmeriGas Propane, 844 F. Supp. at 390 (citing Tenn. Code Ann. § 47-50-112(a) (contracts shall be enforced as written, subject to statutory and common law defenses)) (other citations omitted). The court therefore finds that the public interest would be served if a preliminary injunction were granted enforcing the contract provision barring solicitation of current ISMG employees.

#### 5. Balancing All the Factors

Despite the fact that ISMG has demonstrated a strong likelihood of success on the merits of its claim for breach of contract with respect to Sawyer's solicitation of the security services contract at the Financial Center for Citadel, as set forth in the discussion regarding alleged breach of loyalty, it is not clear to what extent ISMG suffered damages resulting specifically from that breach as distinct from injury suffered merely as a result of Sawyer's departure. Moreover, the remaining factors do not weigh in favor of entry of a preliminary injunction barring Defendants from finalizing and performing the contract for the provision of private security services at the Financial Center.

On the other hand, the factors generally weigh in favor of an injunction enforcing the contract provision barring solicitation of current ISMG employees

#### D. Intentional Interference With Business Relations

#### 1. Likelihood Of Success On the Merits

Tennessee has recently recognized the tort of intentional interference with business relations, but the scope of this tort is narrow and its elements clearly defined. According to the Tennessee Supreme Court, liability should be imposed upon an "interfering party" only if the plaintiff can demonstrate: "(1) an existing business relationship with specific third parties or a prospective relationship with an identifiable class of third persons; (2) the defendant's knowledge of that relationship and not a mere awareness of the plaintiff's business dealings with others in general; (3) the defendant's intent to cause the breach or termination of the business relationship; (4) the defendant's improper motive or improper means; and finally, (5) damages

resulting from the tortious interference. <u>Trau-Med of Am., Inc. v. Allstate Ins. Co.</u>, 71 S.W.3d 691, 701 (Tenn. 2002) (internal citations and footnotes omitted).

In the case at bar, it seems highly likely that ISMG, with respect to Sawyer's and Citadel's pursuit of the Financial Center contract, could establish the first three and fifth elements of this claim. ISMG had a prospective relationship with the Financial Center; Sawyer and Citadel knew about that relationship; Sawyer and Citadel intended to cause termination of that relationship; and that ISMG suffered damages as a result. The fourth element, however, is not so readily established. With respect to that element, the Tennessee Supreme Court has noted that a plaintiff must "demonstrate that the defendant's predominant purpose was to injure the plaintiff." <u>Id.</u> at 701 n.5. In fact, "to provide further guidance" as to what may constitute an actionable interference, the court cited the following methods as "some examples of improper interference":

> those means that are illegal or independently tortious such as violations of statutes, regulations, or recognized common-law rules; violence, threats or intimidation, bribery, unfounded litigation, fraud, misrepresentation or deceit, defamation, duress, undue influence, misuse of inside or confidential information, or breach of a fiduciary relationship; and those methods that violate an established standard of a trade or profession, or otherwise involve unethical conduct, such as sharp dealing, overreaching, or unfair competition.

<u>Id.</u> (internal citations omitted). On the other hand, merely acting in furtherance of one's own economic interest is not an improper motive. <u>See</u> <u>Leigh Furniture & Carpet Co. v. Isom</u>, 657 P.2d 293, 307–08 (Utah 1982), <u>cited in</u> <u>Trau-Med</u>, 71 S.W.3d at 701 n.5. In evaluating a plaintiff's motive for signs of impropriety, a court must determine whether "the acts of which complaint is made . . . rest on some legitimate interest, or if there is sharp dealing or overreaching or other conduct below the behavior of fair men similarly situated. . . [. T]he line of demarcation between permissible behavior and interference reflects the ethical standards of the community. " <u>Trau-Med</u>, 71 S.W.3d at 700–01 (citation omitted).

One basis ISMG raises in support of a finding of "improper motive" on Defendants' part is the fact that Citadel had not actually become licensed as a contract security company at the time it bid for and was awarded the Financial Center contract toward the end of April 2006. It did not actually receive its license until May 1, 2006. The Court finds that this point is immaterial, however, first because there is no evidence that Sawyer and Cesternino affirmatively misrepresented Citadel's status as licensed or unlicensed, and second, Citadel never actually provided security services prior to receipt of its license. <u>Cf.</u> Tenn. Code Ann. § 62-35-130(a)(2) & (8) (providing that disciplinary action may be taken against any company that has practiced fraud,

deceit or misrepresentation, or "[a]cted as a contract security company or proprietary security company without a currently valid license").

ISMG also appears to argue that Sawyer "spent much of his time" in the months prior to his resignation "misappropriating ISMG's confidential business information and trade secrets," which enabled him to obtain the security services contract at the Financial Center for Citadel. The Court finds the causal relationship between any alleged or actual misappropriation of trade secrets and Citadel's successful bid for the Financial Center security services contract to be quite tenuous. Because the tort at issue is narrowly drawn and of limited application, the Court finds that ISMG has not demonstrated a substantial likelihood of success on the merits of its claim for tortious interference with prospective business relations.

### 2. The Other Factors

Regardless of the likelihood of success, however, the same analysis applied to breach of contract and breach of loyalty claims applies here: Whatever damage might have resulted from the alleged interference is likely minimal and has already occurred; issuance of a preliminary injunction will not prevent any additional injury to ISMG. Thus, the risk of injury to Defendants and to other third parties if an injunction is entered outweighs the risk of harm to ISMG if the injunction is not entered, and no legitimate public interests would be advanced by entry of the requested injunction. In sum, the relevant factors weigh against entry of a preliminary injunction barring Defendants from finalizing and performing the contract for the provision of private security services at the Financial Center.

### E. Violation Of the Computer Fraud and Abuse Act

#### 1. Likelihood Of Success On the Merits

ISMG alleges that defendants have violated the Computer Fraud and Abuse Act, 18 U.S.C. § 1030 ("CFAA"), and specifically that provision of it which provides recourse against any person who, "knowingly and with intent to defraud, accesses a protected computer without authorization, or exceeds authorized access, and by means of such conduct furthers the intended fraud and obtains anything of value." 18 U.S.C. § 1030(a)(4). An employee who exceeds authorized access to an employer's computer may violate the CFAA. See Pac. Aerospace & Elec., Inc. v. Taylor, 295 F. Supp. 2d 1188, 1196–97 (E.D. Wash. 2003); EF Cultural Travel BV v. Explorica, Inc., 274 F.3d 577, 581–83 (1st Cir. 2001); Shurgard Storage Ctrs., Inc. v. Safeguard Self Storage, Inc., 119 F. Supp. 2d 1121, 1124–25 (W.D. Wash. 2000).

25

There is no dispute that Sawyer exceeded his authority when he e-mailed to Cesternino and Gary Conrad documents that ISMG considers proprietary and trade secret. While defendants argue that Sawyer had no fraudulent intent in forwarding documents to Cesternino and that ISMG has suffered no damages, Sawyer has admitted that he provided certain pricing information to Cesternino for use in Citadel's proposal forms. Thus, based on the standard set forth above, the Court finds that ISMG has established a likelihood of success on the merits of this claim.

### 2. The Possibility Of Irreparable Harm and the Other Factors

Regardless of whether Sawyer actually violated the CFAA, there is no dispute that he no longer has access to ISMG's computers, and he has apparently returned to ISMG all hard- and electronic-copies of ISMG's documents. Issuance of an injunction now will not have the effect of preventing further damage to ISMG. Entry of an injunction is not likely to harm Defendants or other third parties either, simply because it is unlikely to have any effect on the them at all, nor will public interests be affected one way or the other.

### 3. Balancing All the Factors

The relevant factors do not weigh in favor of entry of a preliminary injunction barring Defendants from further violation of the CFAA. As discussed above in connection with the claim for misappropriation of trade secrets and/or confidential business information, however, Defendants will be enjoined from any future use of proprietary information that remains in their possession.

### F. Whether Injunction Applies Both To Sawyer and Citadel

In its response in opposition to ISMG's motion, Defendants argue generally that any restrictive covenants contained in the Employment Agreement apply only to Sawyer personally but do not restrict or apply to Citadel generally or to any other principal or employee of Citadel, namely, Rob Cesternino. In support of this argument, Defendants cite to the case of Brasfield v. Anesthesia Services, P.C., 1999 WL 817507 (Tenn. Ct. App. Oct. 13, 1999).

In that case, the Tennessee Court of Appeals found that the relevant covenant not to compete, by its terms, restricted the former employee personally from practicing medicine in competition with his former medical group/employer but did not restrict or apply to the other physicians in the already-existing competing medical group of which he became a shareholder. The non-compete in question simply provided: "[U]pon any termination of employment, Physician shall not thereafter practice medicine in any facility in which the

26

Corporation is providing services or is negotiating to provide services at the time of his termination." Id. at *3. The court stated that reading the contract to prohibit the physician's new group or the other physicians in that group from practicing medicine at the facility at issue would require the court "to broaden the language of the contract to include a provision stipulating that a terminating employee is not permitted to join a group of doctors who practice at a facility of the type described in the contract." Id.

In the case at bar, however, there is an almost complete identity between Sawyer and Citadel, particularly since Citadel has only one other principal and employee, Cesternino, and Cesternino lives and works in Seattle. Sawyer is effectively the face and arm of Citadel, even if Cesternino is its brain. Consequently, the Court concludes that any restriction in the Employment Agreement pertaining to Sawyer also restricts Citadel.

### G. Fed. R. Civ. P. 65(c)'s Security Requirement

Although Federal Rule of Civil Procedure 65(c) might seem to require the movant to post bond to secure preliminary injunctive relief, the Sixth Circuit recognizes the court's discretion not to require security. See Moltan Co. v. Eagle-Picher Indus., 55 F.3d 1171, 1176 (6th Cir. 1995) (citations omitted). Because this temporary restraint to be issued herein will cause no discernible monetary damage to the defendants, ISMG need not post security. See, e.g., Fehribach v. City of Troy, 321 F. Supp. 2d 727, 734 (E.D. Mich. 2004) (because plaintiff was very likely to succeed and defendant suffered no loss or damage as a result of preliminary injunction, court waived bond requirement). If ISMG has already posted a bond (which is unclear from the docket), it may retire or withdraw it.

### V. CONCLUSION

In sum, based upon the above analysis, the Court finds as follows:

1. ISMG's request for a preliminary injunction prohibiting Defendants from destroying any documents, materials, information or other property, including electronically stored information related to the subject matter set forth in Plaintiff's complaint, will be denied on the basis that no evidence was presented at the hearing suggesting that Defendants have engaged in such unlawful destructive behavior in the past nor that they will do so in the future.

2. ISMG's request for a preliminary injunction requiring Defendants immediately to return to ISMG any of its property in the Defendants' possession, custody or control, will be denied on the basis that

ISMG has conceded that Defendants have already complied with the prior Temporary Restraining Order requiring such action.

3.     ISMG's request for a preliminary injunction prohibiting Defendants from disclosing or making use of any of ISMG's Business Secrets, as that term is defined in the Employment Agreement, will be granted under the terms set forth above. Specifically, both Defendants shall be barred from continued use of any of ISMG's pricing information and from listing or naming ISMG's clients as "references" in ISMG's proposal forms.

4.     With respect to ISMG's request for a preliminary injunction prohibiting Defendants from (1) soliciting or (2) performing private security services for any existing client of Plaintiff with whom Defendant Sawyer had contact or administrative responsibility while employed by ISMG, including Colliers Turley Martin Tucker, the Court finds as follows:

(a) Defendants have agreed in open court that they are prohibited from and that they will refrain from contacting, soliciting, or providing private security services for any current clients of ISMG, including the eight buildings in Tennessee for which ISMG presently provides private security services, for one year following the effective date of Sawyer's resignation from ISMG. Accordingly, Plaintiff's motion to convert the TRO as to this issue into a preliminary injunction will be granted.

(b) It is completely unreasonable to construe the term "actual client" as used in the Employment Agreement to include Colliers Turley Martin Tucker generally, as such an interpretation would preclude Defendants from soliciting business or providing services at a vast number of buildings in Tennessee and Kentucky for which Plaintiff does not now and has not ever provided security services, and with respect to which Plaintiff has never submitted proposals for the provision of security services. Plaintiff's motion to convert the TRO into a preliminary injunction barring Defendants from soliciting or performing private security services for any building in Tennessee or Kentucky managed by Colliers will therefore be denied.

(c) The Financial Center qualifies as a prospective client under the Employment Agreement, and ISMG has presented evidence indicating that Defendant Sawyer breached

the Employment Agreement and otherwise may be subject to liability under Tennessee law in connection with his and Defendant Citadel's solicitation of the security services contract at the Financial Center. Notwithstanding, ISMG has not established that entry of a preliminary injunction prohibiting Defendants from going forward with execution and performance of the contract with the Financial Center is warranted. It is likely that the Financial Center contract likely would not have been awarded to ISMG even if Sawyer had not solicited it for Citadel, and probably would not be awarded to ISMG even if Citadel were enjoined from going forward with finalizing and performing the security services contract at the Financial Center. Awarding prospective injunctive relief would not prevent further injury from occurring, nor would maintaining the *status quo* benefit any of the parties involved, including the Financial Center and Colliers as well as Plaintiff and Defendants. Plaintiff's motion to convert the TRO into a preliminary injunction barring Defendants from providing security services at the Financial Center for one year following Sawyer's resignation date will therefore be denied.

5.      ISMG's request for a preliminary injunction enforcing the Employment Agreement provision prohibiting Defendant Sawyer from "solicit[ing] or aid[ing] a competing provider of private security business services to solicit any person who is employed by the Company at the time Employee's employment is terminated, to terminate that person's employment [with] the [Plaintiff] and to accept employment with a competing provider of private business security services," will be granted. As discussed above, the Court finds that the act of placing a generic advertisement in the Tennessean seeking qualified applicants, without disclosing Defendant Sawyer's involvement with the company placing the ad, does not constitute "solicitation," but that the acts of interviewing, negotiating with, persuading or making a job offer to a current ISMG employee to come work for Citadel would constitute "solicitation" under the ordinary meaning of the term. ISMG's motion to enter a preliminary injunction enforcing the Employment Agreement provision barring Defendants from soliciting current ISMG employees to work for Citadel will be granted.

Plaintiff shall no longer be required to post a bond.

An appropriate Preliminary Injunction consistent with this Opinion will enter.


Thomas A. Wiseman, Jr.
Senior U.S. District Judge